UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JAMAL COOPER, | |
| Movant, | Case No. 3:19-cv-01007 |
| v. | Judge Aleta A. Trauger |
| | Magistrate Judge Alistair E. Newbern |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

To:     The Honorable Aleta A. Trauger, District Judge

## REPORT AND RECOMMENDATION

Jamal Cooper is serving a 396-month sentence at the Federal Correctional Institution in Manchester, Kentucky, after pleading guilty to six counts of drug trafficking and firearms offenses in this Court. Plea Agreement, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Jan. 3, 2017), ECF No. 1360; Order Accepting Plea Petition, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Jan. 3, 2017), ECF No. 1359; Judgment, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Apr. 19, 2017), ECF No. 1504. Cooper has now filed a pro se motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. (Doc. No. 1.) The Court determined on preliminary review that Cooper's motion states a cognizable claim of ineffective assistance of counsel and ordered the United States to answer or otherwise respond to the motion. (Doc. No. 3.) The United States filed an answer (Doc. No. 9), and Cooper filed a reply with the assistance of counsel (Doc. No. 36). The Court referred the action to the Magistrate Judge for a report and recommendation on Cooper's motion. (Doc. No. 33.) For the reasons that follow, the Magistrate Judge will recommend that the Court deny Cooper's motion.

# I.        Factual and Procedural Background

## A.        Criminal Investigation and Prosecution

Cooper's prosecution arose out of a federal taskforce investigation into narcotics trafficking in Nashville, Tennessee, that began in 2013. (Doc. No. 18.) During the investigation, the United States sought and obtained an order from the Court authorizing a wiretap to intercept communications to and from Target Telephone 1 (TT1), believed to be used by Cooper's co-defendant Eric Eugene Williams, and Target Telephone 2 (TT2), believed to be used by Cooper. Order, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Dec. 19, 2014), ECF No. 455-2. The order authorized interception of communications on both lines for 30 days. *Id.* The United States intercepted Cooper's calls on TT2 for approximately two weeks. Application for Sealing of Wire and Electronic Communications, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Dec. 19, 2014), ECF No. 455-4. The United States did not intercept any conversations from TT1 because Williams stopped using that phone number before the wiretap was granted. *Id.*

The United States charged Cooper by criminal complaint and arrested him on May 19, 2014. Complaint, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. May 19, 2014), ECF No. 1; Arrest Warrant, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. May 19, 2014), ECF No. 3. A superseding indictment issued charging Cooper and twenty-one other defendants on June 25, 2014. Superseding Indictment, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. June 25, 2014), ECF No. 17. Cooper was named in nine counts of drug trafficking and firearms offenses.

Cooper—represented by his first trial counsel, Michael J. Flanagan—moved to suppress the TT2 recordings and any derivative evidence, arguing that the United States failed to establish the necessity for the wiretap and failed to immediately make the recordings available to the Court for sealing as required by statute. Memorandum of Law in Support of Motion to Suppress, *United*

*States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Dec. 28, 2014), ECF No. 465. The Court denied Cooper's motion to suppress, finding that the government's affidavits demonstrated the necessity of the wiretap and that the government complied with applicable sealing requirements. Memorandum and Order, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Dec. Jan. 16, 2015), ECF No. 524.

Almost a year later, Cooper moved to substitute counsel, Flanagan moved to withdraw, and the Court granted both motions. Order, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Jan. 20, 2016), ECF No. 876. Attorney John Bailey entered an appearance on Cooper's behalf on January 22, 2016. Notice of Appearance, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Jan. 22, 2016), ECF No. 878.

Less than a week later, the United States filed a second superseding indictment against Cooper and seven co-defendants. Second Superseding Indictment, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Jan. 27, 2016), ECF No. 882. The second superseding indictment charged Cooper with eleven counts of drug trafficking and firearms offenses, including conspiracy to distribute and possess with intent to distribute heroin and fentanyl (Count 1); conspiracy to distribute and possess with intent to distribute marijuana (Count 2); conspiracy to distribute and possess with intent to distribute methamphetamine (Count 3); distribution and possession with intent to distribute heroin (Counts 4, 6 and 7); distribution and possession with intent to distribute fentanyl (Count 5); conspiracy to possess and discharge a firearm in furtherance of drug trafficking (Count 8); possession of a firearm in furtherance of drug trafficking (Count 9); carry, use, and discharge of a firearm during and in relation to drug trafficking (Count 10); and possession of a firearm after a felony conviction (Count 12). *Id.*

In September 2016, Cooper—represented by Bailey—filed a second motion to suppress the intercepted TT2 communications and any derivative evidence, arguing that the United States made material misrepresentations and omissions in its affidavits supporting the wiretap application and that Cooper was entitled to an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). Motion to Suppress Evidence, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Sept. 29, 2016), ECF No. 1210. Cooper further argued that the government violated 18 U.S.C. § 2518(1)(c) "by offering generalized statements concerning two or more potential targets in its application for permission to use wiretaps" and that the recordings of conversations between Cooper and various confidential informants were nonconsensual and therefore illegal. *Id.* at 11, ¶ 22; *id.* at 12. The Court denied Cooper's request for a *Franks* hearing and denied his second motion to suppress. Memorandum and Order, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Dec. 21, 2016), ECF No. 1309.

Cooper sent the Court a handwritten letter dated December 27, 2016, stating that his attorney-client relationship with Bailey "ha[d] diminished possibly beyond repair" and that he had "written a formal complaint to the Board of Professional Responsibility" regarding Bailey's representation. Letter from Jamal Cooper to Judge Aleta A. Trauger at 1, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Jan. 4, 2017), ECF No. 1363 [hereinafter Letter]. Cooper complained about Bailey's work on the second motion to suppress, stating that Bailey did not clearly articulate the United States' factual misrepresentations and failed to present all of the supporting factual and legal bases that Cooper had instructed him to present, including an argument that the government improperly sought two wiretaps in one affidavit. *Id.* at 2–6. Cooper further argued that the United States used TT1 as a pretext to obtain a court-ordered wiretap on TT2. *Id.* at 5.

The Court held a hearing on December 30, 2016, and questioned Cooper about his letter in a lengthy ex parte discussion.[1] Unsealed Transcript Excerpt of December 30, 2016 Motion Hearing, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Oct. 4, 2017), ECF No. 1568. The Court then announced on the record that Cooper's concerns came "down to a *Franks* issue . . . . [H]e maintains that the government . . . basically boot strapped TT1 to get TT2, which was his phone, knowing at the time that TT1 wasn't being used anymore." *Id.* at 4. The Court stated that it was "not convinced that" Cooper and Bailey's relationship was "irreparably severed at all" and that it seemed instead "they ha[d] quite a good relationship." *Id.* at 5. The Court took a recess to consider Cooper's *Franks* argument and the corresponding record evidence. After the recess, the Court found that Cooper had not identified any record evidence supporting his assertion that the government knew Williams had stopped using TT1 when it applied for the wiretap on TT1 and TT2. *Id.* at 8–12. The Court further stated that it did not appear that Bailey had omitted anything material in presenting Cooper's second motion to suppress. *Id.* at 12, 14.

On January 3, 2017, Cooper entered into a plea agreement with the United States in which he agreed to plead guilty to Counts 1, 2, 3, 8, 10, and 12 of the second superseding indictment and the United States agreed to dismiss Counts 4, 5, 6, 7, and 9. Plea Agreement, ECF No. 1360. As part of the plea agreement, Cooper admitted that the following facts were true and established his guilt beyond a reasonable doubt:

> a)  Beginning in or around Summer 2013, the exact date being unknown to the Grand Jury, and continuing up to and including June 2014, in the Middle District of Tennessee, and elsewhere, JAMAL COOPER a/k/a Jamal Jordan, a/k/a J, a/k/a Mal, LONALD ECTOR a/k/a J.R., KARON KEY JORDAN, WILTON BAILEY a/k/a Willy Will, CLIFFORD WOODS,

---

[1]  The discussion, which is redacted from the public version of the hearing transcript, takes up approximately fifteen pages of the transcript. Unsealed Transcript Excerpt of December 30, 2016 Motion Hearing, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Oct. 4, 2017), ECF No. 1568.

TOMMY E. SMITH, DARNELL FINNELS, a/k/a Ski, a/k/a Skeezy and ROBERT NOEL, a/k/a Kamp Trey, did combine, conspire and agree each other and other persons known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with intent to distribute, one (1) kilogram or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, and a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code Section 841(a)(1). All in violation of Title 21, United States Code, Section 846.

b)      Beginning in or around Summer 2013, the exact date being unknown to the Grand Jury, and continuing up to and including June, 2014, in the Middle District of Tennessee, and elsewhere, [1] LONALD ECTOR, a/k/a J.R., [4] JAMAL COOPER, a/k/a Jamal Jordan, a/k/a J, a/k/a Mal, and [5] KARON KEY JORDAN, did combine, conspire, confederate and agree with each other, and other persons known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with intent to distribute 50 kilograms or less of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance in violation of Title 21, United States Code, Section 841(a)(1). All in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.

c)      Beginning in or around Summer 2013, the exact date being unknown to the Grand Jury, and continuing up to and including June, 2014, in the Middle District of Tennessee, and elsewhere, [1] LONALD ECTOR, a/k/a J.R., [4] JAMAL COOPER, a/k/a Jamal Jordan, a/k/a J, a/k/a Mal, and [5] KARON KEY JORDAN, did combine, conspire, confederate and agree with each other, and other persons known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance in violation of Title 21, United States Code, Section 841(a)(1). All in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.

d)      Beginning in or about March 31, 2014, and continuing through on or about June 26, 2014, in the Middle District of Tennessee, JAMAL COOPER a/k/a Jamal Jordan, a/k/a Mal, KARON KEY JORDAN, DARNELL FINNELS, a/k/a Ski, a/k/a Skeezy and ROBERT NOEL, a/k/a Kamp Trey, did combine, conspire, confederate, and agree with each other, and with other persons known and unkown [sic] to the Grand Jury, to knowingly possess and discharge a firearm, to wit: a Ruger, Model P95, 9mm caliber, semi-automatic [sic] pistol, in furtherance of a drug trafficking crime for which they may be prosecuted in a court of the United States, in violation of

Title 18, United States Code, Sections 924(c)(1)(A). All in violation of
Title 18, United States Code, Sections 924(o) and (2).

e)      On or about April 4, 2014, in the Middle District of Tennessee, JAMAL
COOPER a/k/a Jamal Jordan, a/k/a Mal, KARON KEY JORDAN,
DARNELL FINNELS, a/k/a Ski, a/k/a Skeezy and ROBERT NOEL, a/k/a
Kamp Trey, did knowingly carry, use, and discharge a firearm, to wit: a
Ruger, Model P95, 9mm Semi-Automatic Pistol, during and in relation to a
drug trafficking crime for with [sic] he may be prosecuted in a court of the
United States, to wit: conspiracy to distribute and to possess with intent to
distribute drugs and narcotics in violation of Title 21, United States Code,
Section 846. All in violation of Title 18, United States Code,
Sections 924(c)(1)(A) and (2).

f)      Beginning on or about April 4, 2014, through June 26, 2014, in the Middle
District of Tennessee, JAMAL COOPER a/k/a Jamal Jordan, a/k/a Mal,
DARNELL FINNELS, a/k/a Ski, a/k/a Skeezy and ROBERT NOEL, a/k/a
Kamp Trey, having each been convicted in any court of a crime punishable
by imprisonment for a term exceeding one (1) year, did knowingly possess,
in and affecting commerce, a firearm, to wit: a Ruger, Model P95, 9mm
semi-automatic pistol. In violation of Title 18, United States Code,
Sections 922(g)(1), 924 and 2.

g)      In 2013, the Metropolitan Nashville Police Department (MNPD) Gang
Unit, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and the
Drug Enforcement Administration began to investigate the heroin
trafficking activities of JAMAL COOPER a/k/a Jamal Jordan, a/k/a J, a/k/a
Mal and others. All told, during the several month investigation, law
enforcement conducted court authorized Title III wire and electronic
surveillance over several target telephones, purchased and seized over 100
grams of heroin and an amount of fentanyl and confiscated approximately
$90,000 United States currency from members of the drug trafficking
conspiracy. The investigation, to include Title III surveillance, revealed that
from approximately September 2013 to June 2014, a conspiracy to
distribute and possess with intent to distribute in excess of one (1) kilogram
or more of a mixture and substance containing a detectable amount of
heroin, a Schedule I controlled substance, and a mixture or substance
containing a detectable amount of fentanyl, a Schedule II controlled
substance.

h)      As part of the investigation controlled purchases of heroin were made from
JAMAL COOPER, ROBERT FOX, and ERIC WILLIAMS.

i)      JAMAL COOPER a/k/a Jamal Jordan a/k/a "J" a/k/a Mal (hereinafter
COOPER) was a participant in the conspiracy to distribute heroin and
fentanyl. COOPER engaged in the trafficking of heroin and fentanyl with
KARON KEY JORDAN (hereinafter JORDAN), ERIC WILLIAMS a/k/a

"E", JASMOND FOSTER a/k/a Jazz, WILLIAM FOSTER a/k/a Buck, TOMMY E. SMITH, CLIFFORD WOODS a/k/a Wimpy, DARNELL FINNELS a/k/a Ski a/k/a Skeezy, ROBERT NOEL a/k/a Kamp Trey, WILTON BAILEY a/k/a Willy Will, and others. COOPER is JORDAN'S half-brother. COOPER participated in this conspiracy during the time period between the Summer of 2013 through June 2014. As part of this conspiracy and during this time frame COOPER distributed over 10 kilograms of heroin and less than 14 kilograms of heroin. COOPER also distributed fentanyl during this time period. COOPER was a leader or organizer in the conspiracy to distribute heroin.

j)    JAMAL COOPER was a participant in the conspiracy to distribute marijuana. COOPER engaged in the trafficking of marijuana with JORDAN, ROBERT GONZALES, LONALD ECTOR, and others. COOPER participated in this conspiracy during the time period between the March 2014 through June 2014. During this time period COOPER received and distributed kilogram quantities of marijuana. The amount distributed during this time period was more than 10 kilograms and less than 20 kilograms of marijuana. COOPER was a leader or organizer in the conspiracy to distribute marijuana.

k)    JAMAL COOPER was a participant in the conspiracy to distribute methamphetamine. COOPER engaged in the trafficking of methamphetamine with JORDAN, LONALD ECTOR a/k/a JR, ROBERT GONZALES, and others. COOPER participated in this conspiracy during the time period between the March 2014 through June 2014. As part of this conspiracy and during this time frame COOPER distributed approximately 920 grams of methamphetamine. The methamphetamine conspiracy involved at least 500 grams of a mixture or substance containing methamphetamine and less than 1.5 kilograms of a mixture or substance containing methamphetamine. COOPER was a leader or organizer in the conspiracy to distribute methamphetamine.

l)    As part of the conspiracy to distribute heroin and fentanyl, ERIC WILLIAMS a/k/a "E" received information on or about March 31, 2014 that "Dray-C" (identified as DeAndre'se Jenkins) and "G-Ray" (identified as Raymond Johnson) were plotting to rob COOPER of drugs and drug proceeds. WILLIAMS received this information from ROBERT NOEL a/k/a "Kamp Trey" and DARNELL FINNELS a/k/a "Ski" a/k/a "Skeezy." WILLIAMS conveyed this information to COOPER. COOPER conveyed this information to JORDAN. COOPER and WILLIAMS discussed the action to be taken and determined to enlist ROBERT NOEL a/k/a "Kamp Trey" and DARNELL FINNELS a/k/a "Ski" a/k/a "Skeezy" to make a preemptive strike against Jenkins and Johnson to protect their drugs and drug proceeds. COOPER also conveyed this information to JORDAN and discussed the action to be taken with JORDAN. JORDAN encouraged COOPER to make the preemptive strike. COOPER and WILLIAMS, in

recorded phone conversations, discussed luring Jenkins and Johnson to a location behind Haynes Garden Apartments, located at 2715 Whites Creek Pike, Nashville, Tennessee for the purpose of beating Jenkins and Johnson to obtain information regarding the drug and drug money robbery plan.

m)  On or about April 3, 2014, COOPER spoke, via cell phone, to WILLAIMS [sic] and others regarding possible locations of Raymond Johnson a/k/a "G-Ray." One of those locations was the James Caycee housing complex in Nashville, Tennessee. JORDAN spoke with COOPER and was aware that COOPER was going to look for Raymond Johnson a/k/a "G-Ray." JORDAN knew COOPER was going to carry a firearm on this date for the purpose of shooting at Johnson as a preemptive strike to protect COOPER'S and JORDAN's drug distribution operation. On that date, COOPER went [sic] the James Caycee housing complex looking for Raymond Johnson a/k/a "G-Ray." COOPER met with DONQUEZ GROVES a/k/a "Lewis Palmer" a/k/a "Lil Donnie" and Jay Hood. Prior to arriving at the James Caycee housing complex, COOPER told GROVES that he had the guns in the vehicle. Due to a large presence of law enforcement officers in the area, COOPER did not follow through with finding Raymond Johnson at that time. After COOPER determined the area had too many law enforcement officers, COOPER called SHETEEKA BRYANT and told her that his mother would get the car and guns. COOPER further told BRYANT that the car he came in was his wife's (Joyce) car. This car was determined to be a Red Altima which law enforcement observed to be present at the James Caycee housing complex at the time of this call. Law enforcement officers observed COOPER's mother later arrive at the James Caycee housing complex in a red sports utility vehicle, exit that vehicle, and enter and drive the Red Altima from the housing complex.

n)  On April 4, 2014, as part of the agreement between WILLIAMS, COOPER, FINNELS, and NOEL to strike against DeAndre'se Jenkins and Raymond Johnson, NOEL, who was in Nashville, Tennessee, contacted Jenkins (who is a blood cousin of NOEL). NOEL asked Jenkins to pick NOEL up at an address on Haywood Lane as NOEL had had an altercation with his girlfriend. This statement was not true, and NOEL made this statement to Jenkins for the purpose of luring Jenkins to a pre-determined location for Jenkins to be shot. When Jenkins picked NOEL up, NOEL had Jenkins drive to 2549 Highland Trace, Nashville, TN, which is located by Haynes Garden Apartments. This was a location agreed upon by ERIC WILLIAMS, FINNELS, and NOEL, for the location to shoot Jenkins. NOEL and Jenkins arrived at this location at approximately 3 a.m. — 4 a.m. When NOEL parked at the duplex and was talking to Jenkins, FINNELS and WILLIAMS parked in the Haynes Garden apartment complex. FINNELS, possessing a Ruger, P95, 9mm pistol, serial number 318-79295, exited the vehicle he occupied with WILLIAMS and crossed through a wooded area for the purpose of coming up behind the vehicle NOEL and Jenkins occupied. After a few minutes, Jenkins and NOEL got out of the vehicle to urinate behind

the car. At this point, FINNELS shot at Jenkins multiple times. Jenkins, hearing a gunshot, moved to the passenger side of his vehicle for protection and NOEL ran away from the car. Jenkins sustained a gunshot wound to his hand, breaking his ring finger. The person who shot Jenkins was FINNELS.

o)    Subsequent to the shooting, COOPER and WILLIAMS discussed paying FINNELS with heroin for the shooting. FINNELS was in fact paid in heroin for shooting at Jenkins. COOPER supplied the heroin that was used to pay FINNELS. There were also calls intercepted through the wiretap in which COOPER referenced the shooting to other persons and discussed FINNELS as the shooter. NOEL received heroin as payment for NOEL'S participation in the shooting. COOPER supplied the heroin that NOEL received as payment.

p)    On June 26, 2014, a search warrant was executed at 312A Arrington Street, Nashville, TN, the residence of ROBERT NOEL a/k/a "Kamp Trey". Recovered at the residence was a Ruger, P95, 9mm pistol, serial number 318-79295, 15 rounds of 9mm ammunition, and 8 rounds of .40 caliber ammunition. A ballistic examination of the recovered shell casings at the scene of the shooting of DeAndre'se Jenkins establishes that the shell casings were fired from the Ruger P95 9mm pistol serial number 318-79295 recovered from NOEL'S address. This firearm was not manufactured in the state of Tennessee and therefore traveled interstate or foreign commerce.

q)    COOPER encouraged FINNELS and NOEL to possess and use the Ruger, P95, 9mm pistol, serial number 318-79295, 15 rounds of 9mm ammunition, and 8 rounds of .40 caliber ammunition for the purpose of shooting at Jenkins. It was foreseeable to COOPER as part of the conspiracy to possess firearms in furtherance of his drug trafficking crimes, which were in violation of federal law, that this firearm, as well as the firearm possessed by COOPER on April 3, 2014, would be carried and/or possessed for such purpose.

r)    COOPER was convicted on or about April 30, 2007, in. the United States District Court, Middle District of Tennessee, Case No. 3:06-CR-00198-002 of Conspiracy to Possess With Intent to Distribute Five Kilograms or More of Cocaine, and was sentenced to 48 months (4 years) imprisonment. This offense constitutes a felony offense for which a maximum term of imprisonment of one year or more may be imposed.

*Id.* at 6–14, ¶¶ 8(a)–(r).

The plea agreement included a waiver of Cooper's appellate rights with limited exceptions:

Regarding the issue of guilt, defendant hereby waives all (i) rights to appeal any issue bearing on the determination of whether he is guilty of the crime(s) to which he is agreeing to plead guilty and (ii) trial rights that might have been available if

he exercised his right to go to trial, except defendant reserves the right to appeal the Orders issued at Docket Entry 524, 1181, 1309, and the District Court's Oral Order of December 30, 2016, denying defendant's handwritten *Franks* motion which was received by the Court on December 30, 2016 reflected at docket entry 1334. Regarding sentencing, Defendant is aware that 18 U.S.C. § 3742 generally affords a defendant the right to appeal the sentence imposed. Acknowledging this, defendant knowingly waives the right to appeal any sentence of 396 months imprisonment as agreed to in this plea agreement. Defendant also knowingly waives the right to challenge that agreed sentence imposed in any motion pursuant to 18 U.S.C. § 3582(c) and in any collateral attack, including, but not limited to, a motion brought pursuant to 28 U.S.C. § 2255 and/or § 2241. However, no waiver of the right to appeal, or to challenge the adjudication of guilt or the sentence imposed in any collateral attack, shall apply to a claim of involuntariness, prosecutorial misconduct, or ineffective assistance of counsel. Likewise, the government waives the right to appeal any sentence of 396 months imprisonment as set forth in this plea agreement.

*Id.* at 23, ¶ 17.

The Court held a plea hearing on January 3, 2017. Criminal Minutes, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Jan. 3, 2017), ECF No. 1358. A government witness read the agreed facts establishing guilt into the record. Transcript, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Aug. 7, 2020), ECF No. 1718. The Court read each charge of the second superseding indictment and questioned Cooper about his understanding of the plea agreement. *Id.* The Court's questioning of Cooper included the following exchange while Cooper was under oath:

> THE COURT: You are proposing to plead guilty under a plea agreement with the government. Have you read both the petition to enter a plea of guilty and the plea agreement?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Feel you understand both these documents?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Have you had enough time to discuss them with Mr. Bailey?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: All right. I want to go over your plea agreement with you at this time. You are pleading guilty to Counts One, Two, Three, Eight, Ten and

Twelve of the second superseding indictment. And the remaining counts will be dismissed at the time of your sentencing.

In pleading guilty, you are admitting the facts set out on pages 6 through 14 of this plea agreement and that those facts establish your guilt beyond a reasonable doubt. Have you read those facts very carefully and are you prepared to admit that they are true?

THE DEFENDANT: Yes, ma'am.

*Id.* at 11–12. Following the hearing, the Court accepted the plea agreement. Order Accepting Plea Petition, ECF No. 1359.

The Court held a sentencing hearing on April 12, 2017. Criminal Minutes, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Apr. 12, 2017), ECF No. 1493. Pursuant to the plea agreement, the Court sentenced Cooper to a term of imprisonment of 396 months. Judgment, ECF No. 1504; Statement of Reasons and Excerpt of Sentencing Hearing Transcript, *United States v. Cooper*, No. 3:14-cr-00090 (M.D. Tenn. Apr. 19, 2017), ECF No. 1505.

## B. Direct Appeal

Cooper appealed the Court's denial of his suppression and *Franks* motions to the Sixth Circuit with the assistance of counsel Eileen M. Parrish. Brief of Appellant Jamal Cooper, *United States v. Cooper*, No. 17-5475 (6th Cir. Sept. 14, 2017), ECF No. 19. The Sixth Circuit affirmed this Court's decisions, holding that "the use of a single application to wiretap multiple phones" is permissible under 18 U.S.C. § 2518(1)(c), that the finding that the government's "affidavit contained facts sufficient to demonstrate the necessity of the wiretap . . . [was] not clearly erroneous[,]" and that Cooper had not shown that a *Franks* hearing was necessary. *United States v. Cooper*, 893 F.3d 840, 843, 844, 845 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 855 (2019). The Sixth Circuit further held that the government's presentation of the TT2 recordings for sealing "satisfie[d] the 'immediately' requirement of § 2518(8)(a)" and that the Court did not err in finding that recordings of conversations with confidential informants were consensual based on the

confidential informants' awareness that their conversations were being recorded. *Id.* at 845, 846. Cooper petitioned the Supreme Court for a writ of certiorari, and the Supreme Court denied Cooper's petition. *Cooper v. United States*, 139 S. Ct. 855 (2019).

### C. § 2255 Motion

On November 1, 2019, Cooper filed a pro se motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.[2] (Doc. No. 1.) Cooper identifies twenty-six grounds for relief, many of which address the same issues.

In Claim 1, Cooper argues that the waiver of appellate rights in his plea agreement is unconstitutionally broad and invalid under *United States v. Chua*, 349 F. Supp. 3d 214 (E.D.N.Y. 2018). (*Id.*)

In Claim 2, Cooper argues that Bailey and the Court deprived him of his Sixth Amendment right to counsel by disregarding Cooper's letter complaining about Bailey's representation. (*Id.*)

In Claim 3, Cooper asserts that Bailey did not effectively articulate the government's specific misrepresentations in the wiretap affidavit and that this ineffective assistance of counsel prevented Cooper from entering a voluntary and knowing guilty plea. (*Id.*)

In Claims 4 through 11, Cooper asserts Fourth Amendment violations and related ineffective assistance of counsel claims based on the United States' use of cell-site location

---

[2]     Under the standard governing filings by pro se incarcerated litigants—known as the "prison mailbox rule"—"a pro se prisoner's [pleading] is deemed filed when it is handed over to prison officials for mailing to the court." *Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008). The rationale for this rule is that "pro se prisoners have no control over delays between the prison authorities' receipt of [a pleading] and its filing, and their lack of freedom bars them from delivering the [pleading] to the court clerk personally." *Houston v. Lack*, 487 U.S. 266, 273–74 (1988). Courts assume, "absent contrary evidence," that an incarcerated person delivered a legal filing to prison authorities "on the date he or she signed [it]." *Brand*, 526 F.3d at 925. Cooper signed his § 2255 motion on November 1, 2019. (Doc. No. 1.)

information (CSLI), "pinging" of Cooper's cell phone, and GPS tracking of vehicles and Cooper's cell phone during the investigation leading to Cooper's prosecution. (*Id.*)

In Claims 12 through 14, Cooper argues that warrants authorizing the wiretaps were invalid under the Supreme Court's decision in *Dahda v. United States*, 138 S. Ct. 1491 (2018), because they authorized the United States to intercept communications outside of the Court's territorial jurisdiction. (*Id.*) Cooper further argues that Flanagan and Bailey were ineffective for failing to move to suppress the wiretap evidence on this ground. (*Id.*)

In Claim 15, Cooper asserts that Bailey was ineffective for failing to move to dismiss the second superseding indictment based on prosecutorial vindictiveness. (*Id.*)

In Claims 16 and 17, Cooper argues that the Court should not have accepted his guilty plea for Counts 1 through 3 of the second superseding indictment because there was insufficient evidence to show that Cooper knew the drug quantities included in the charges. (*Id.*) He further argues that Bailey was ineffective for providing Cooper with incorrect and misleading legal advice on this issue. (*Id.*)

Claims 18 through 21 concern the firearms charges in Counts 8 and 10. (*Id.*) Cooper argues that there was insufficient evidence that he personally used, carried, and discharged a firearm or facilitated his codefendants' use, carrying, and discharge of a firearm. (*Id.*) He further argues that the Court lacked jurisdiction to enter judgment on Count 8 and that Bailey was ineffective because he did not explain to Cooper the advance-knowledge requirement for accomplice liability under *Rosemond v. United States*, 572 U.S. 65 (2014). (*Id.*)

Claim 22 argues that Cooper's conviction for Count 12—the felon-in-possession charge—is unconstitutional under *Rehaif v. United States*, 139 S. Ct. 2191 (2019). (*Id.*)

Claims 23 through 25 argue that Bailey was ineffective for failing to properly advise Cooper regarding sentencing guidelines calculations and failing to raise certain objections to the guidelines calculation included in the presentence investigation report. (*Id.*)

In Claim 26, Cooper argues that Parrish provided ineffective assistance on appeal because Cooper wrote the substance of his principal appellate brief and Parrish merely formatted it for filing. (*Id.*) Cooper further argues that Parrish was ineffective because she waived oral argument and did not file a reply brief. (*Id.*)

The Court examined Cooper's § 2255 motion as required under Rule 4(b) of the Rules Governing Section 2255 Proceedings, found that the "motion raises a cognizable claim of ineffective assistance of counsel[,]" and ordered the United States to file an answer or otherwise respond to Cooper's motion in accordance with Rule 5. (Doc. No. 3.) The United States answered Cooper's motion, arguing, among other things, that the waiver of appellate rights in the plea agreement is valid, that many of Cooper's claims fall within the scope of the waiver, and that many of the other claims are not cognizable under § 2255 or are subject to a bar on relitigation. (Doc. No. 9.) The United States further argues that, to the extent Cooper claims ineffective assistance of counsel, his claims must fail because he has not shown deficient performance by his counsel or resulting prejudice. (*Id.*)

Cooper filed a pro se motion for discovery, appointment of counsel, and an evidentiary hearing (Doc. No. 12), to which the United States responded in opposition (Doc. No. 16.) The Court denied Cooper's request for discovery, finding that Cooper had failed to show that the requested discovery, if allowed, would be reasonably likely to enable him to demonstrate his counsel's ineffectiveness. (Doc. No. 18.) The Court denied without prejudice Cooper's requests for appointment of counsel and an evidentiary hearing. (*Id.*)

Cooper then retained counsel and filed a reply brief in support of his § 2255 motion. (Doc. No. 36.) Cooper states in his reply that he "does not concede any of his arguments" from his opening brief (*id.* at PageID# 206); however, he also repeatedly argues "that his claims should be considered, in their entirety, as ineffective assistance of counsel claims" (*id.* at PageID# 211; *see also id.* at PageID# 210 ("Any claims not raised under the banner of ineffective assistance of counsel clearly should have been[.]"); *id.* at PageID# 211 (same)).

## II.      Legal Standard

Section 2255(a) provides that anyone in custody pursuant to a federal court's judgment and sentence "may move the court which imposed the sentence to vacate, set aside or correct the sentence" on "the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]" 28 U.S.C. § 2255(a). To prevail on a § 2255 motion, the movant "must show '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *McPhearson v. United States*, 675 F.3d 553, 559 (6th Cir. 2012) (quoting *Mallett v. United States*, 334 F.3d 491, 496–97 (6th Cir. 2003)). The movant must also show that "an error of constitutional magnitude . . . had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

## III.     Analysis

Based on Cooper's assertions in his counseled filing that his § 2255 claims should be construed as ineffective-assistance-of-counsel claims (Doc. No. 36) and the Court's prior orders characterizing Cooper's § 2255 motion as raising colorable ineffective-assistance-of-counsel

claims (Doc. Nos. 3, 18), the Court construes all of Cooper's arguments in support of his § 2255 motion as arguments that his attorneys provided him with ineffective assistance of counsel.

To establish ineffective assistance of counsel, Cooper must show that (1) his counsel's performance was deficient, and (2) the deficiency prejudiced Cooper's defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The first prong of the *Strickland* test requires a showing "that counsel's representation fell below an objective standard of reasonableness" and "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 688. This standard is highly deferential, and there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689; *see also id.* ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955))). Under the second prong, Cooper must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Supreme Court defines "a reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* Where, as here, a movant "claim[s] that ineffective assistance led to the improvident acceptance of a guilty plea," demonstrating prejudice requires showing "that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (second alteration in original) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). A court need not address both prongs of the inquiry if the movant makes an insufficient showing on one. *Strickland*, 466 U.S. at 697; *see also id.* ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.")

### A.      Claim 1: Waiver of Appellate Rights

Cooper argues that the appeal waiver in his plea agreement is overly broad and therefore unconstitutional under the reasoning of *United States v. Chua*, a decision issued by the U.S. District Court for the Eastern District of New York. (Doc. No. 1.) In *Chua*, the court found that "a near blanket waiver of the right to collateral review without enumeration of all recognized exceptions . . . is not allowed." 349 F. Supp. 3d at 218. Specifically, the *Chua* court found that a "waiver of collateral attack rights must specify what rights have not been waived . . . otherwise a defendant will be under the misimpression that he or she retains only those rights explicitly excluded from the waiver." *Id.* To that end, the *Chua* court found that a collateral attack waiver must include language stating that the defendant cannot waive (1) "challenges to the process leading to the plea that render the plea involuntary and unknowing"; (2) "challenges to the process leading to the plea on the basis that the defendant was provided ineffective assistance of counsel"; (3) "challenges to a proceeding instituted or sentence imposed on the basis of a constitutionally impermissible factor"; and (4) "challenges when foreclosure of the collateral attack right would result in a miscarriage of justice." *Id.* at 218, 219, 220.

*Chua*, of course, is not binding on this Court. Instead, this Court must apply the standards articulated by the Supreme Court and Sixth Circuit regarding appeal waivers, which do not require the inclusion of specific language regarding waiver of collateral attack. In *Garza v. Idaho*, the Supreme Court recognized that "all jurisdictions appear to treat at least some claims as unwaiveable. Most fundamentally, courts agree that defendants retain the right to challenge whether the waiver itself is valid and enforceable . . . . [W]hile signing an appeal waiver means giving up some, many, or even most appellate claims, some claims nevertheless remain." 139 S. Ct. 738, 745 (2019). The Sixth Circuit recognizes that defendants retain the right to challenge the validity of their guilty pleas as involuntary or unknowing or a result of ineffective assistance of

18

counsel. *In re Acosta*, 480 F.3d 421, 422 (6th Cir. 2007). The Sixth Circuit has also held, however, "that 'a defendant in a criminal case may waive any right, even a constitutional right, by means of a plea agreement[,]'" so long as the court informs the defendant of the waiver's terms as required by Federal Rule of Criminal Procedure 11(b). *United States v. Sharp*, 442 F.3d 946, 949 (6th Cir. 2006) (quoting *United States v. McGilvery*, 403 F.3d 361, 362 (6th Cir. 2005)).

The appeal waiver included in Cooper's plea agreement specifically reserved his "right to appeal the Orders issued at Docket Entry 524, 1181, 1309, and the District Court's Oral Order of December 30, 2016, denying defendant's handwritten *Franks* motion which was received by the Court on December 30, 2016 reflected at docket entry 1334." Plea Agreement at 23, ¶ 17, ECF No. 1360. The waiver also established that Cooper retained the right to appeal "a claim of involuntariness, prosecutorial misconduct, or ineffective assistance of counsel." *Id.* Thus, the waiver provision is not a "blanket waiver" of the sort warned against in *Chua*. To the extent the waiver does not include the precise language dictated by that decision, controlling authority in this Court does not require it.

### B.     Claims 2 and 3: Cooper's December 27, 2016 Letter

Cooper argues that Bailey was ineffective for disregarding Cooper's request for new counsel made in his December 27, 2016 letter to the Court, for insufficiently investigating misrepresentations made in the government's wiretap affidavits, and for failing to make arguments about those misrepresentations to the Court. (Doc. No. 1.) Cooper has not shown the prejudice required to satisfy the second *Strickland* prong with respect to either claim.

Cooper's letter complained about Bailey's handling of the second suppression motion and listed various arguments that Cooper had instructed Bailey to make in that motion, including arguments about misrepresentations and omissions in the wiretap affidavit. Letter, ECF No. 1363. The record shows that the Court discussed the letter with Cooper and Bailey at length during the

December 30, 2016 hearing, considered the arguments that Cooper identified in his letter and arguments Bailey made on Cooper's behalf in the hearing, and concluded that none of those arguments had merit. Unsealed Transcript Excerpt of December 30, 2016 Motion Hearing, ECF No. 1568. Because the Court considered the arguments Cooper wanted Bailey to make and found them without merit, Cooper cannot show a reasonable probability that the Court would have ruled differently on the second suppression motion if Bailey had made the arguments on Cooper's behalf. Further, at the end of the hearing, the Court asked Cooper if he still "want[ed] a new lawyer." *Id.* at 23. Cooper stated he was "fine with Mr. Bailey" and confirmed that, to the extent his letter could be construed as a request for a new attorney, he had withdrawn that request. *Id.* Cooper has thus waived any claim that Bailey provided ineffective assistance by failing to withdraw as Cooper's counsel.

Based on this record, Cooper has not shown a reasonable probability that the Court would have ruled differently on the second suppression motion if Bailey had moved to withdraw as counsel or presented the arguments in Cooper's letter to the Court. *See Strickland*, 466 U.S. at 694. Nor has Cooper shown that, but for Bailey's alleged errors, there is a reasonable probability that Cooper would not have pleaded guilty and would have insisted on going to trial. *See Lafler*, 566 U.S. at 163.

**C.      Claims 4, 8, 10, and 11: Cell-Site Location Information**

Cooper argues that Flanagan and Bailey were ineffective for failing to move to suppress evidence on the ground that the United States' collection of CSLI without a warrant violated the Fourth Amendment and that Parrish was ineffective for failing to raise this issue on appeal. (Doc. No. 1.) Cooper relies on *Carpenter v. United States*, 138 S. Ct. 2206 (2018), in which the Supreme Court reversed a decision of the Sixth Circuit and held "that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI" and

"that the Government must generally obtain a warrant supported by probable cause before acquiring such records." 138 S. Ct. at 2217, 2221. The Supreme Court issued its opinion in *Carpenter* on June 22, 2018, the same day that the Sixth Circuit denied Cooper's direct appeal. Until that day, the state of the law in the Sixth Circuit did not require the government to obtain a warrant to collect CSLI. *United States v. Carpenter*, 819 F.3d 880 (6th Cir. 2016), *rev'd*, 138 S. Ct. 2206 (2018). Cooper's counsel followed controlling precedent, and Cooper therefore has not shown any deficiency under *Strickland*. *See, e.g.*, *Lott v. Coyle*, 261 F.3d 594, 609 (6th Cir. 2001) ("[N]onegregious errors such as failure to perceive or anticipate a change in the law . . . generally cannot be considered ineffective assistance of counsel[.]" (second alteration in original) (quoting *Alcorn v. Smith*, 781 F.2d 58, 62 (6th Cir. 1986)); *Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 288 (6th Cir. 2010) ("[A]ppellate counsel is not ineffective for failing to predict the development of the law.").

Further, in denying Cooper's motion for discovery, this Court found that "the Sixth Circuit [has] determined that warrantless CSLI searches conducted before the 2018 Supreme Court decision in *Carpenter* would not require suppression if officers acted in good faith reliance on existing law 'when they obtained the data.'" (Doc. No. 18, PageID# 168–69 (quoting *United States v. Pritchard*, 964 F.3d 513, 528–29 (6th Cir. 2020).) Cooper has not argued or given any basis to find that the officers who obtained CSLI in his case did not act in good faith reliance on existing law. Again, he has not shown any deficiency in his counsel's representation. *See Strickland*, 466 U.S. at 694; *Lafler*, 566 U.S. at 163.

### D.     Claims 5 through 10: "Pinging" and GPS Tracking

Cooper argues that Flanagan and Bailey were ineffective for failing to move to suppress the wiretap evidence on the ground that (1) the United States' "pinging" of cell phones to determine their real-time locations was unlawful; and (2) the United States' use of GPS tracking

devices on certain vehicles was unlawful because the judge who issued the warrants authorizing the GPS tracking—Davidson County General Sessions Court Judge Casey Moreland—was not impartial. (Doc. No. 1; *see also* Doc. No. 18, PageID# 165–66 ("The movant [ ] ultimately contends that his unlawfully obtained location data tainted all subsequent warrant applications in which it was used, including the TT2 wiretap application, and that his counsel was ineffective in failing to move to suppress the wiretap evidence on this basis.").)

The Court addressed these arguments in denying Cooper's motion for discovery. (Doc. No. 18.) The Court found that, "even if the GPS warrants were informed by unlawfully obtained, real-time location data or were otherwise defective, [Cooper] has not shown reason to believe that the wiretap evidence would have been subject to suppression as fruit of the poisonous tree." (*Id.* at PageID# 169.) The Court cited two reasons that the wiretap evidence would not be subject to suppression on these grounds:

> First, "[t]hough evidence obtained in violation of the Fourth Amendment is generally excluded, the Supreme Court has held that the exclusionary rule should be modified so as not to bar the admission of evidence seized in reasonable, good faith reliance on a search warrant that is subsequently held to be defective." *United States v. Carpenter*, 926 F.3d 313, 317 (6th Cir. 2019) (citation and internal quotation marks omitted). While the movant argues that the wiretap and GPS warrants were defective because of their reliance on prior location data obtained without a warrant or their issuance by Moreland, he does not explicitly argue that law enforcement procured or executed them unreasonably or in bad faith.

> Second, the fruit of the poisonous tree doctrine will not preclude the admission of evidence that is so attenuated from the illegal search that the taint is thereby dissipated. *United States v. Williams*, 615 F.3d 657, 668 (6th Cir. 2010) (quoting *Wong Sun v. United States*, 371 U.S. 471, 491 (1963)). "The Supreme Court has explained the attenuation doctrine as follows: 'We need not hold that all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made had been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the taint.'" *United States v. Fofana*, 666 F.3d 985, 992–93 (6th Cir. 2012) (quoting *Wong Sun*, 371 U.S. at 487–77). Here, the movant seeks discovery that he believes may reveal a domino effect between the government's use of tainted location data "to place him

in certain drug distribution points" and to associate his phone with other targeted phones, and its eventual showing of the propriety and necessity of a wiretap. (Doc. No. 12 at 2.) But "[t]he nexus between the original illegality and the specific evidence subject to challenge must be a close one[;] . . . [i]t is not sufficient to demonstrate taint that an unlawful [search] may have been a factor in the decision to target a specific defendant or that an illegal search uncovers the alleged perpetrator's identity and therefore directs attention to a particular suspect." *United States v. Chavez-Chavez*, No. 07CR1408 WQH, 2008 WL 1847229, at *8 (S.D. Cal. Apr. 22, 2008) (citations and internal quotation marks omitted).

Although the movant argues that the unlawfully procured GPS data was "crucial" to the sufficiency of the wiretap application (Doc. No. 12 at 3), this argument is not persuasive. This is not a case where the use of location data directly produced fruit in the form of a seizure of the movant's person or a search of the location where the data revealed the movant to be. *Cf., e.g.*, *United States v. Hermiz*, 42 F. Supp. 3d 856, 869 (E.D. Mich. 2014) (finding no attenuation where GPS tracker placed on vehicle without a warrant and drugs were seized upon stop of the vehicle following alert from tracker). In fact, to obtain wiretap authorization from the court, the government was required to demonstrate that its use of location data was *un*fruitful. *See* 18 U.S.C. § 2518(3)(c) (requiring wiretap application to demonstrate that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed"). Law enforcement primarily built their case against the movant using multiple confidential sources, two of whom conducted recorded telephone calls with the movant before carrying out controlled purchases of heroin from him, on December 12, 2013 and March 11, 2014. (*Id.* at 22–24, 27–29; *see also* Doc. No. 465, Cooper's First Motion to Suppress, at 4 ("The Defendant submits considerable information has been developed through the use of confidential sources.").) Such intervening audio, visual, and physical evidence of criminal activity would seem sufficient to disconnect the subsequent wiretap application and interceptions from any initial, unlawful tracking of the movant's location in real time.

(*Id.* at PageID# 169–71 (alterations in original).)

For the same reasons, Cooper has not shown a reasonable probability that, but for Flanagan's and Bailey's failure to move to suppress the wiretap evidence on these grounds, the result of the suppression hearing would have been different and he would not have pleaded guilty. *See Strickland*, 466 U.S. at 694; *Lafler*, 566 U.S. at 163.

E.    **Claims 12 through 14: Interception of Communications Outside the Authorizing Court's Territorial Jurisdiction**

Cooper argues that Flanagan and Bailey were ineffective for failing to move to suppress wiretap evidence on the ground that the warrant authorizing the wiretap was insufficient on its face under 28 U.S.C. § 2518(10)(a)(ii) because it purportedly authorized the United States to intercept communications outside the territorial jurisdiction of the authorizing court. (Doc. No. 1.) Specifically, Cooper alleges that, "[a]lthough the government intercepted communications from a listening post within Tennessee, it intercepted additional communications from a listening post outside of Tennessee, including Arkansas and California, among others." (*Id.* at PageID# 49.) Cooper also argues that Parrish was ineffective for failing to raise this issue on appeal. (Doc. No. 1.)

Cooper relies on *Dahda v. United States*, 138 S. Ct. 1491 (2018), to support this argument. (*Id.*) In *Dahda*, the Supreme Court explained that:

> A judge's authorizing authority normally extends only within statutorily defined bounds. The [Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq.] specifies that an order can permit the interception of communications "within the territorial jurisdiction of the court in which the judge is sitting." § 2518(3). (There is an exception allowing interception beyond the judge's territorial jurisdiction if the judge authorizes a "mobile interception device," *ibid.*, but the parties now agree that exception does not apply to these Orders.) The Government here adds (without the Dahdas' disagreement) that an intercept takes place *either* where the tapped telephone is located *or* where the Government's "listening post" is located. *See* § 2510(4) (defining "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device"); *see also* Brief for Petitioners 11; Brief for United States 6. As so interpreted, the statute generally requires that one or the other or both of these locations must be found within the authorizing judge's "territorial jurisdiction."

138 S. Ct. at 1495. The wiretap orders at issue in *Dahda* each "contained a sentence that read as follows:"

> Pursuant to Title 18, United States Code § 2518(3), it is further Ordered that, in the event TARGET TELEPHONE # 1, TARGET TELEPHONE # 3 and TARGET

> TELEPHONE # 4, are transported *outside the territorial jurisdiction of the court*, interception may take place in any other jurisdiction within the United States." App. 105 (under seal) (emphasis added); *see also id.*, at 97, 114, 123, 132, 140, 149, 158, 166, 174 (Orders containing identical language but targeting different telephones).

*Id.* In deciding whether the orders in *Dahda* were insufficient under § 2518(10)(a)(ii), the Supreme Court "assume[d] the relevant sentence exceeded the judge's statutory authority[,]" but found that "none of the communications unlawfully intercepted outside the judge's territorial jurisdiction were introduced at trial, so the inclusion of the extra sentence had no significant adverse effect upon the Dahdas." *Id.* at 1494.

The record shows that the order authorizing the TT1 and TT2 wiretaps in Cooper's criminal proceedings is distinguishable from the orders at issue in *Dahda*. *See* Order, ECF No. 455-2. The order in Cooper's case provides that:

> IT IS FURTHER ORDERED THAT, for purposes of Title 18, United States Code, Section 2518(3), in the event that Target Telephone 1 and/or Target Telephone 2 is transferred outside the territorial jurisdiction of this Court, interception may continue in the Middle District of Tennessee where intercepted communications over the target telephones will be first heard, read, and minimized.

*Id.* at 7. Thus, the Court only authorized the government to monitor TT1 and TT2 outside the Court's jurisdiction if it did so from a listening post located within the Court's jurisdiction. Cooper has not shown that this order conflicts with the Supreme Court's holding in *Dahda*. He also has not identified any record evidence to support his assertion that the United States intercepted communications on TT2 from listening posts in Arkansas and California. Cooper therefore has not carried his burden to show that Flanagan, Bailey, and Parrish were ineffective for failing to raise this argument in a motion to suppress or on appeal. Further, to the extent Cooper argues that Flanagan and Bailey were ineffective for failing to raise arguments under *Dahda*, his claim fails because the Supreme Court decided *Dahda* after this Court entered judgment in Cooper's case.

Attorneys generally will not be found ineffective for failing to anticipate developments in the law. *See Thompson*, 598 F.3d at 288; *Lott*, 261 F.3d at 609.

F.      **Claim 15: Prosecutorial Vindictiveness**

Cooper argues that the government filed a second superseding indictment charging him "with more serious offenses in retaliation for his successful motion to substitute counsel" and that Bailey was ineffective for failing to move to dismiss the second superseding indictment based on "prosecutorial vindictiveness." (Doc. No. 1, PageID# 50.)

"Due process 'prohibits an individual from being punished for exercising a protected statutory or constitutional right.'" *United States v. Roach*, 502 F.3d 425, 443 (6th Cir. 2007) (quoting *United States v. Poole*, 407 F.3d 767, 774 (6th Cir. 2005)). Specifically, due process prohibits "'possibilities of increased punishment . . . that pose a realistic likelihood of vindictiveness.'" *Id.* (quoting *Blackledge v. Perry*, 417 U.S. 21, 27 (1974)). In *United States v. Dupree*, the Sixth Circuit explained that, to prevail on a prosecutorial vindictiveness claim, a defendant must show:

> (1) exercise of a protected right; (2) the prosecutor's "stake" in the exercise of that right; (3) the unreasonableness of the prosecutor's conduct; and, presumably, (4) that the prosecution was initiated with the intent to punish the plaintiff for the exercise of the protected right. Thus, a person claiming to be vindictively prosecuted, must show that the prosecutor had some "stake" in deterring the petitioner's exercise of his rights, and that the prosecutor's conduct was somehow unreasonable.

323 F.3d 480, 489 (6th Cir. 2003) (quoting *Nat'l Eng'g & Contracting Co. v. Herman*, 181 F.3d 715, 723 (6th Cir. 1999)). There are two ways a defendant can make this showing:

> a defendant can show (1) "actual vindictiveness," by producing "objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights," or (2) "a realistic likelihood of vindictiveness," by utilizing the framework outlined above (focusing on the prosecutor's "stake" in deterring the exercise of a protected right and the unreasonableness of his actions). *Bragan v. Poindexter*, 249 F.3d 476, 481–82 (6th Cir.2001). Attempting to show actual vindictiveness has

been characterized as "exceedingly difficult" and an "onerous burden." *Id.* at 481, 483.

*Id.*

Cooper argues "that the new charges were not based on any new evidence that the government acquired after the initial indictment" and that the government therefore "could have charged him with the harsher drug and firearms crimes at any point in the twenty months in which his prosecution had been pending, but . . . chose[ ] to do so only after Cooper secured a change of counsel[.]" (Doc. No. 1, PageID# 51.) Cooper asserts that the government was "confronting the prospect of duplicative expenditures of resources" on a second motion to suppress "with [Cooper's] new counsel coming on board[,]" that "[t]he government had no sound reason to file . . . more charges at that point," and that its decision to do so "was a presumptively retaliatory response to [Cooper's] successful change-of-counsel motion." (*Id.*; *see also id.* at PageID# 53 ("[Cooper] saddled the government with the prospect of restar[t]ing its defense of defendant-filed motions from scratch.").) The United States responds that "substitution of counsel . . . occurs routinely in criminal cases" and that "Cooper cannot establish that the government had any prosecutorial stake in his motion for new counsel." (Doc. No. 9, PageID# 115–16.) Cooper replies that, "as obtaining new counsel takes time and delays prosecution, the government may well have been upset about such delay." (Doc. No. 36, PageID# 212.)

Cooper offers nothing more than speculation to support his argument that the prosecution sought a second superseding indictment in retaliation for Cooper's substitution of counsel. *See Dupree*, 323 F.3d at 489. Nor has he shown that the prosecution had any stake in the outcome of Cooper's motion to substitute counsel to trigger a presumption of vindictiveness. *See id.* To the contrary, the record shows that the United States did not oppose Cooper's motion to substitute counsel and that, in granting the motion, the Court stated that it intended to keep the upcoming

trial date in place "absent extraordinary circumstances." Order at 1, ECF No. 876. Cooper's

reliance on *United States v. LaDeau*, 734 F.3d 561 (6th Cir. 2013), is misplaced. In that case, the

Sixth Circuit affirmed a district court's dismissal of a superseding indictment for prosecutorial

vindictiveness when the government filed significantly more serious charges against the defendant

after the defendant successfully moved to suppress the government's key evidence. *Id.* at 564–73.

Comparable circumstances are not present here.

Based on this record, Cooper has not shown a reasonable probability that, if Bailey had

moved to dismiss the second superseding indictment for prosecutorial vindictiveness, the Court

would have granted the motion. *See Strickland*, 466 U.S. at 694. Nor has Cooper shown that, but

for Bailey's alleged errors, there is a reasonable probability that Cooper would not have pleaded

guilty and would have insisted on going to trial. *See Lafler*, 566 U.S. at 163.

### G.  Claims 16 and 17: Conspiracy to Distribute and Possess Narcotics

Cooper argues that his plea was not knowingly entered with respect to Counts 1, 2, and 3—

conspiracy to distribute and possess with the intent to distribute heroine and fentanyl (Count 1),

marijuana (Count 2), and methamphetamine (Count 3) in violation of 21 U.S.C. §§ 841(a) and

846—"because Bailey provided him with incorrect and misleading legal advice." (Doc. No. 1,

PageID# 57.) Specifically, Cooper argues that:

> Bailey informed Cooper that one convicted of an § 846 conspiracy for distributing
> specifically defined amounts of narcotics becomes subject to the mandat[or]y
> minimums and enhanced statutory maximums of § 841(b)(l)(A) regardless of his
> knowledge concerning the quantity or type of the drug actually distributed. Bailey
> should have counseled him, instead, that co-conspirator liability attaches only if a
> defendant knew or reasonably could have foreseen the type and quantity of the
> substance that the co-conspirator transported.

(*Id.*) Cooper further argues that "Bailey's advice caused [him] to reasonably assume the

government would not be required to prove to the jury knowledge or reasonable foreseeability"

and that, "[h]ad Bailey properly advised him that the government must prove intent or reasonable

foreseeability, he would not have pled guilty." (*Id.* at PageID# 57–58.) The United States responds that this claim fails because, even if Bailey gave Cooper the advice Cooper recounts, that advice was not deficient. (Doc. No. 9.)

The Sixth Circuit has held "that the government need not 'prove mens rea as to the type and quantity of the drugs' in order to establish a violation of § 841" or § 846. *United States v. Villarce*, 323 F.3d 435, 439 (6th Cir. 2003) (quoting *United States v. Garcia*, 252 F.3d 838, 844 (6th Cir. 2001)). Instead, the mens rea element of § 841 and § 846 "requires nothing more specific than an intent to distribute a controlled substance[,]" and "drug type and quantity are [therefore] irrelevant" to this requirement. *Id.*; *see also United States v. Dugalic*, 489 F. App'x 10, 18 (6th Cir. 2012) ("[T]he Government was not required to show that [defendant] knew the exact quantity of marijuana involved in order to obtain a conviction under § 846. The Government [ ] was only required to prove that [defendant] knew that '*some* quantity' of marijuana was involved." (first citing *Villarce*, 323 F.3d at 439; and then quoting *id.* at 438)).

Cooper has not shown that that Bailey's advice fell outside the range of effective assistance of counsel. *See Strickland*, 466 U.S. at 689.

## H.    Claims 18 through 21: Possession and Use of Firearms in Relation to Drug Trafficking

Count 8 of the second superseding indictment charged that, between March 31, 2014, and June 26, 2014, Cooper conspired to knowingly possess and discharge a Ruger Model P95 9mm caliber semiautomatic pistol in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(o), or aided and abetted that conspiracy in violation of 18 U.S.C. § 2. Second Superseding Indictment, ECF No. 882. Count 10 charged that, on April 4, 2014, Cooper knowingly carried, used, and discharged a Ruger Model P95 9mm semiautomatic pistol during

and in relation to a drug trafficking crime in violation of § 924(c)(1)(A), or aided and abetted the

carry, use, and discharge of the firearm in violation of § 2. *Id.*

In the plea agreement, Cooper admitted the following facts relevant to Counts 8 and 10:

l)     As part of the conspiracy to distribute heroin and fentanyl, ERIC WILLIAMS a/k/a "E" received information on or about March 31, 2014 that "Dray-C" (identified as DeAndre'se Jenkins) and "G-Ray" (identified as Raymond Johnson) were plotting to rob COOPER of drugs and drug proceeds. WILLIAMS received this information from ROBERT NOEL a/k/a "Kamp Trey" and DARNELL FINNELS a/k/a "Ski" a/k/a "Skeezy." WILLIAMS conveyed this information to COOPER. COOPER conveyed this information to JORDAN. COOPER and WILLIAMS discussed the action to be taken and determined to enlist ROBERT NOEL a/k/a "Kamp Trey" and DARNELL FINNELS a/k/a "Ski" a/k/a "Skeezy" to make a preemptive strike against Jenkins and Johnson to protect their drugs and drug proceeds. COOPER also conveyed this information to JORDAN and discussed the action to be taken with JORDAN. JORDAN encouraged COOPER to make the preemptive strike. COOPER and WILLIAMS, in recorded phone conversations, discussed luring Jenkins and Johnson to a location behind Haynes Garden Apartments, located at 2715 Whites Creek Pike, Nashville, Tennessee for the purpose of beating Jenkins and Johnson to obtain information regarding the drug and drug money robbery plan.

m)     On or about April 3, 2014, COOPER spoke, via cell phone, to WILLAIMS [sic] and others regarding possible locations of Raymond Johnson a/k/a "G-Ray." One of those locations was the James Caycee housing complex in Nashville, Tennessee. JORDAN spoke with COOPER and was aware that COOPER was going to look for Raymond Johnson a/k/a "G-Ray." JORDAN knew COOPER was going to carry a firearm on this date for the purpose of shooting at Johnson as a preemptive strike to protect COOPER'S and JORDAN's drug distribution operation. On that date, COOPER went [sic] the James Caycee housing complex looking for Raymond Johnson a/k/a "G-Ray." COOPER met with DONQUEZ GROVES a/k/a "Lewis Palmer" a/k/a "Lil Donnie" and Jay Hood. Prior to arriving at the James Caycee housing complex, COOPER told GROVES that he had the guns in the vehicle. Due to a large presence of law enforcement officers in the area, COOPER did not follow through with finding Raymond Johnson at that time. After COOPER determined the area had too many law enforcement officers, COOPER called SHETEEKA BRYANT and told her that his mother would get the car and guns. COOPER further told BRYANT that the car he came in was his wife's (Joyce) car. This car was determined to be a Red Altima which law enforcement observed to be present at the James Caycee housing complex at the time of this call. Law enforcement officers observed COOPER's mother later arrive at the James Caycee housing

complex in a red sports utility vehicle, exit that vehicle, and enter and drive the Red Altima from the housing complex.

n)    On April 4, 2014, as part of the agreement between WILLIAMS, COOPER, FINNELS, and NOEL to strike against DeAndre'se Jenkins and Raymond Johnson, NOEL, who was in Nashville, Tennessee, contacted Jenkins (who is a blood cousin of NOEL). NOEL asked Jenkins to pick NOEL up at an address on Haywood Lane as NOEL had had an altercation with his girlfriend. This statement was not true, and NOEL made this statement to Jenkins for the purpose of luring Jenkins to a pre-determined location for Jenkins to be shot. When Jenkins picked NOEL up, NOEL had Jenkins drive to 2549 Highland Trace, Nashville, TN, which is located by Haynes Garden Apartments. This was a location agreed upon by ERIC WILLIAMS, FINNELS, and NOEL, for the location to shoot Jenkins. NOEL and Jenkins arrived at this location at approximately 3 a.m. — 4 a.m. When NOEL parked at the duplex and was talking to Jenkins, FINNELS and WILLIAMS parked in the Haynes Garden apartment complex. FINNELS, possessing a Ruger, P95, 9mm pistol, serial number 318-79295, exited the vehicle he occupied with WILLIAMS and crossed through a wooded area for the purpose of coming up behind the vehicle NOEL and Jenkins occupied. After a few minutes, Jenkins and NOEL got out of the vehicle to urinate behind the car. At this point, FINNELS shot at Jenkins multiple times. Jenkins, hearing a gunshot, moved to the passenger side of his vehicle for protection and NOEL ran away from the car. Jenkins sustained a gunshot wound to his hand, breaking his ring finger. The person who shot Jenkins was FINNELS.

o)    Subsequent to the shooting, COOPER and WILLIAMS discussed paying FINNELS with heroin for the shooting. FINNELS was in fact paid in heroin for shooting at Jenkins. COOPER supplied the heroin that was used to pay FINNELS. There were also calls intercepted through the wiretap in which COOPER referenced the shooting to other persons and discussed FINNELS as the shooter. NOEL received heroin as payment for NOEL'S participation in the shooting. COOPER supplied the heroin that NOEL received as payment.

p)    On June 26, 2014, a search warrant was executed at 312A Arrington Street, Nashville, TN, the residence of ROBERT NOEL a/k/a "Kamp Trey". Recovered at the residence was a Ruger, P95, 9mm pistol, serial number 318-79295, 15 rounds of 9mm ammunition, and 8 rounds of .40 caliber ammunition. A ballistic examination of the recovered shell casings at the scene of the shooting of DeAndre'se Jenkins establishes that the shell casings were fired from the Ruger P95 9mm pistol serial number 318-79295 recovered from NOEL'S address. This firearm was not manufactured in the state of Tennessee and therefore traveled in interstate or foreign commerce.

q)    COOPER encouraged FINNELS and NOEL to possess and use the Ruger, P95, 9mm pistol, serial number 318-79295, 15 rounds of 9mm ammunition,

31

> and 8 rounds of .40 caliber ammunition for the purpose of shooting at Jenkins. It was foreseeable to COOPER as part of the conspiracy to possess firearms in furtherance of his drug trafficking crimes, which were in violation of federal law, that this firearm, as well as the firearm possessed by COOPER on April 3, 2014, would be carried and/or possessed for such purpose.

Plea Agreement at 10–13, ¶ 8(l)–(q), ECF No. 1360.

Cooper argues that Bailey was ineffective for "fail[ing] to make Cooper aware of the nuances of the § 924(c) statute prior to [entry] of his guilty plea" and that Cooper's plea to Counts 8 and 10 was therefore unknowing. (Doc. No. 1, PageID# 67.) Specifically, Cooper argues that "Bailey failed to explain" "that the so-called preemptive strike was not a legal predicate" to a § 924(c)(1)(A) violation and that "advance knowledge" is required to prove "accomplice liability" under the statute. (*Id.* at PageID# 64.)

Section 924(c)(1)(A) imposes criminal penalties on "any person who, during and in relation to any . . . [federal] drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm . . . ." 18 U.S.C. § 924(c)(1)(A). Cooper's argument that the plan he and his codefendants made to shoot Johnson and made and executed to shoot Jenkins for purposes of protecting their drugs and drug proceeds falls outside the statute is unpersuasive. (*See* Doc. No. 1 at PageID# 64 ("A preemptive strike does not count.").) The Court explained to Cooper during his plea hearing that the government's theory was that Cooper and his codefendants carried and used firearms against Johnson and Jenkins "during and in relation to the drug conspiracy charged in Count One." Transcript at 35, ECF No. 1718. The Supreme Court and Sixth Circuit have construed the phrase "in relation to" broadly, holding "that the 'in relation to' element of § 924(c)(1) 'is met if the gun facilitates or has the potential of facilitating the drug trafficking offense.'" *United States v. Mobley*, 618 F.3d 539, 549 (6th Cir. 2010) (quoting *United States v. Warwick*, 167 F.3d 965, 971 (6th Cir. 1999)); *see also Smith v. United States*, 508 U.S.

223, 237 (1993) (same). There is no question, based on the facts Cooper admitted in the plea agreement, that the guns Cooper and his codefendants carried and planned to use against Johnson and Jenkins facilitated or had the potential to facilitate their drug distribution conspiracy. Cooper therefore has not carried his burden to show that Bailey's counseling on this offense fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688.

Cooper's argument that Bailey was ineffective for failing to explain that the United States must show that he had advance knowledge that a codefendant would use or carry a gun in furtherance of a drug trafficking crime is similarly unpersuasive. (Doc. No. 1.) Cooper admitted in the plea agreement that he "encouraged" two codefendants "to possess and use the Ruger, P95, 9mm pistol, serial number 318-79295, 15 rounds of 9mm ammunition, and 8 rounds of .40 caliber ammunition for the purpose of shooting at Jenkins." Plea Agreement at 13, ECF. No. 1360. The Court explained to Cooper during his plea hearing that, to convict Cooper of Count 8, the United States would have to prove that Cooper "knowingly and voluntarily joined in" a conspiracy "to knowingly possess a firearm in furtherance of a federal drug trafficking crime . . . ." Transcript at 34, ECF No. 1718. The Court explained that there were three ways for the United States to prove Cooper was guilty of Count 10, all of which required that Cooper either knew or could reasonably foresee that one of his codefendants was going to carry, use, and discharge a firearm in furtherance of their drug distribution conspiracy. *Id.* at 34–36. The Court specifically asked Cooper if he thought the United States could prove him guilty of the elements of Counts 8 and 10 at trial, and Cooper replied "Yes, ma'am." *Id.* at 34, 37.

Cooper thus admitted his advance knowledge that his codefendants were going to carry and use a firearm, and the Court explained the advance knowledge requirement to him before Cooper entered into his guilty plea. Cooper therefore cannot show a reasonable probability that,

but for Bailey's failure to explain the advance knowledge requirement, Cooper would not have pleaded guilty and would have insisted on going to trial. *See Lafler*, 566 U.S. at 163.

## I.    Claim 22: Felon In Possession

Count 12 of the second superseding indictment charged Cooper with violating 18 U.S.C. § 922(g)(1) by knowingly possessing a Ruger Model P95 9mm semi-automatic pistol after having been convicted of a felony, or aiding and abetting a § 922(g) violation under 18 U.S.C. § 2. Second Superseding Indictment, ECF No. 882. Section 924(a)(8) provides that "[w]hoever knowingly violates" § 922(g) "shall be fined under this title, imprisoned for not more than 15 years, or both." 18 U.S.C. § 924(a)(8). In *Rehaif v. United States*, the Supreme Court held "that in a prosecution under 18 U.S.C. § 922(g) . . . , the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." 139 S. Ct. 2191, 2200 (2019).

Cooper argues that, under *Rehaif*, he is "actually innocent" of Count 12 and that the second superseding indictment is "void" because it failed to specify Cooper's knowledge of his status as a convicted felon. (Doc. No. 1, PageID# 68.) Construed as an ineffective-assistance-of-counsel claim, this claim asserts that Bailey was ineffective for failing to inform Cooper that, at trial, the United States would have to prove Cooper's knowledge of his prior felony conviction to prove he was guilty of Count 12. This claim fails for two reasons. First, the Supreme Court decided *Rehaif* in 2019, and Cooper cannot show that Bailey was deficient for failing to predict developments in the law. *See Thompson*, 598 F.3d at 288; *Lott*, 261 F.3d at 609. Second, Cooper admitted in the plea agreement that he had a prior federal drug trafficking conviction for which he was sentenced to four years imprisonment and a prior state felony conviction for manslaughter, and the prosecution discussed these convictions during the plea hearing. Plea Agreement, ECF No. 1360; Transcript, ECF No. 1718. The Sixth Circuit has held that "multiple prior convictions" may

indicate that a defendant "undoubtedly knew he was a felon in possession when he possessed the firearms in" question. *United States v. Conley*, 802 F. App'x 919, 923 (6th Cir. 2020). Cooper therefore cannot show that, but for Bailey's failure to advise him of the United States' burden to prove his knowledge of his status as a felon, there is a reasonable probability that Cooper would not have pleaded guilty and would have insisted on going to trial. *See Lafler*, 566 U.S. at 163.

**J.      Claims 23 through 25: Sentencing Guidelines Calculations**

Cooper argues that Bailey was ineffective for failing to object to the Court's sentencing guidelines calculation with respect to Count 12 and failing to inform Cooper that he did not qualify as a career offender based on his prior federal drug trafficking conviction and the instant offenses of conviction in Counts 1, 2, and 3. (Doc. No. 1.) The United States responds that the Court properly calculated the applicable guideline range for Cooper's offenses and that, even if the calculation was incorrect, Cooper cannot show prejudice because the 396-month sentence he accepted in the plea agreement and that the Court imposed falls below both the guideline range that the Court calculated and the range Cooper now argues the Court should have calculated. (Doc. No. 9.) The United States further argues that "[t]here is no reasonable probability that the Court would have rejected the [plea] agreement had trial counsel somehow successfully objected to Cooper's status as a career offender" and points out that, if the Court had rejected the agreement, "the government would have been relieved of its obligation to dismiss Count 9—which means that Cooper would have been facing a mandatory minimum of at least 30 years on Counts 9 and 10 alone[.]" (*Id.* at PageID# 122.) Cooper concedes in his reply that the sentence he received fell below the guideline range, but argues that, "if the parties agreed to a sentence that was 86 months below his Guidelines with the career offender enhancement, it stands to reason that the parties should have agreed to a sentence 86 months below a properly calculated Guideline sentence." (Doc. No. 36, PageID# 216.) Cooper's speculation is insufficient to show that, if Bailey objected

to Cooper's status as a career offender, the Court would have rejected the agreement or that, if Bailey had advised Cooper that he was not a career offender, Cooper would not have pleaded guilty and would have insisted on going to trial. Cooper therefore has not shown the required prejudice. *See Lafler*, 566 U.S. at 163.

### K.      Claim 26: Ineffective Assistance of Appellate Counsel

Cooper argues that Parrish was ineffective on appeal because Cooper wrote his own brief and Parrish "simply formatted" the brief before filing it, because Parrish waived oral argument and did not file a reply brief, and because Parrish did not provide supplemental authority to the Court of Appeals pursuant to Federal Rule of Appellate Procedure 28(j). (Doc. No. 1, PageID# 77.)

The appellate record contradicts Cooper's assertion that Parrish waived oral argument and failed to file a Rule 28(j) letter. The docket shows that the Sixth Circuit initially set oral argument for March 14, 2018. Notice of Oral Argument, *United States v. Cooper*, No. 17-5475 (6th Cir. Jan. 25, 2018), ECF No. 31. Two days before argument, the United States moved for a continuance because its counsel had "learned that his mother [was] in hospice care and [was] anticipated to pass away in the coming days." Motion to Continue Oral Argument at 1, *United States v. Cooper*, No. 17-5475 (6th Cir. Mar. 12, 2018), ECF No. 34. The United States stated that it "ha[d] discussed [its] motion with Eileen Parrish, counsel for Jamal Cooper, and she ha[d] authorized the government to advise the Court that she ha[d] no objection to the motion, but would like oral argument to be rescheduled rather than simply canceled." *Id.* The Sixth Circuit granted the motion in part and denied it in part, stating that "[t]he argument date is cancelled and the case will be submitted on the briefs." Order, *United States v. Cooper*, No. 17-5475 (6th Cir. Mar. 13, 2018), ECF No. 37-1. The docket further shows that Parrish filed a Rule 28(j) letter on March 26, 2018, bringing four additional cases to the court's attention. Additional Citation, *United States v. Cooper*, No. 17-5475 (6th Cir. Mar. 26, 2018), ECF No. 39.

Regarding the briefing on appeal, Cooper argues that "Parrish abdicated her duties to prepare a substantive brief and acquiesced to Cooper's preferred course of preparing the brief." (Doc. No. 1, PageID# 77.) He states that "Parrish did not review what the brief argued against the record and did not ensure that the claims advanced were proper" and complains that the Sixth Circuit found that the arguments in the brief were not meritorious. (*Id.* at PageID# 78.) It is well established that an appellant has no constitutional right to have every nonfrivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750–54 (1983), and tactical choices about which arguments to raise on appeal are properly left to counsel's professional judgment, *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). The seventy-three-page appellate brief Parrish filed on Cooper's behalf raises at least a dozen issues and reflects a substantial amount of legal research. Cooper has not demonstrated that the arguments Parrish raised "were inapplicable or, more importantly, what claims should have been raised on appeal but were not[.]" *Coley v. Bagley*, No. 1:02CV0457, 2010 WL 1375217, at *59 (N.D. Ohio Apr. 5, 2010), *aff'd*, 706 F.3d 741 (6th Cir. 2013). Cooper argues in his reply that Parrish should have raised "every claim raised" in his § 2255 motion that "could have been raised on appeal . . . ." (Doc. No. 36, PageID# 217.) "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). Cooper has not shown that Parrish failed to raise any meritorious argument that he identified.

Similarly, an attorney's failure to file a reply brief on appeal does not automatically demonstrate that the attorney was ineffective. *See, e.g.*, *Martin v. United States*, Civ. Case No. 03-71781, 2007 WL 5497196, at *12 (E.D. Mich. May 17, 2007) (collecting authority for the proposition that "[a]n attorney's decision to waive oral argument and/or refrain from filing a reply

brief does not automatically amount to ineffective assistance of counsel"), *report and recommendation adopted*, 2008 WL 4225835 (E.D. Mich. Mar. 27, 2008). A showing of prejudice is still required, *Barnhill v. United States*, No. 18-3603, 2019 WL 12374126, at *6 (6th Cir. Jan. 14, 2019), and Cooper has not made that showing here.

IV.     **Recommendation**

For these reasons, the Magistrate Judge RECOMMENDS that Cooper's motion to vacate, set aside, or correct his sentence (Doc. No. 1) be DENIED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 13th day of February, 2023.

ALISTAIR E. NEWBERN
United States Magistrate Judge